# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF J.M., by and through his parent, PROMISE MATA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Case No. 3:17-cv-00405** |
| | ) | **Judge Aleta A. Trauger** |
| TENNESSEE DEPARTMENT OF EDUCATION, TENNESSEE STATE BOARD OF EDUCATION, and DICKSON COUNTY SCHOOL DISTRICT, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment (Docket No. 64) filed by the Tennessee Department of Education ("TDOE") and Tennessee State Board of Education ("Board") (collectively, "State Defendants"), to which J.M., by and through his parent, Promise Mata, has filed a Response (Docket No. 78), and the State Defendants have filed a Reply (Docket No. 81), to which J.M. has filed a Surreply (Docket No. 86). For the reasons stated herein, the State Defendants' motion will be granted in part and denied in part.

## I. BACKGROUND

### A. Tennessee's Acceptance of IDEA Funds and Enactment of SEBSA

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017) (citing 20 U.S.C. §§ 1401(3)(A)(i), 1412(a)(1)(A)). Tennessee has participated in the IDEA since its early years. *See*

*Clevenger v. Oak Ridge Sch. Bd.*, 573 F. Supp. 349, 349 (E.D. Tenn. 1983) (applying Act's predecessor in Tennessee), *rev'd on other grounds*, 744 F.2d 514 (6th Cir. 1984).

On July 2, 2007, TDOE then-Commissioner Lana Seivers received a letter from Acting Director Patricia J. Guard of the U.S. Department of Education's Office of Special Education Programs ("OSEP"), giving Commissioner Seivers the presumably welcome news that the OSEP had approved the State of Tennessee's request for IDEA funding for the upcoming federal fiscal year. Letter from Patricia J. Guard, Acting Director, OSEP, to Lana Seivers, Director, TBOE (July 2, 2007) ("2007 Award Letter").[1] Commissioner Seivers and her predecessors had received similar letters each year for many years. *See* 2002 Award Letter–2006 Award Letter. Enclosure A of the 2007 Award Letter included a list of thirty "Assurances" to which Tennessee agreed in exchange for federal funds. 2007 Award Letter, encl. A ("2007 Assurances"). Assurance 1, unsurprisingly, was that a FAPE "is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled." 2007 Assurances at II-2.

As of the date of the 2007 Assurances, a FAPE was defined as special education and related services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) *meet the standards of the State educational agency*;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

---

[1] Available at https://www2.ed.gov/fund/data/award/idea/2007partb/tn-letter-2007b.pdf. The court will cite all other such award letters and enclosures using the same form it will use for the 2007 Award Letter and enclosures. All letters and enclosures since 2002 are available at https://www2.ed.gov/fund/data/award/idea/ptballyears.html#tn.

20 U.S.C. § 1401(9) (2007) (emphasis added). It was, by then, well settled in the Sixth Circuit that, pursuant to § 1401(9)(B), the IDEA "incorporates state law pertaining to educational rights of [disabled] children," and, therefore, "a school district [that] complies with federal law . . . may still violate the Act if it fails to satisfy more extensive state protections that may also be in place." *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 620 (6th Cir. 1990); *see also Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 457 (6th Cir. 1993) (acknowledging rule in Tennessee case but holding that the particular provision at issue did not impose a more stringent standard than the IDEA).

Against this backdrop, the Tennessee General Assembly, in May of 2008, enacted the Special Education Isolation and Restraint Modernization and Positive Behavioral Supports Act ("SEIRMPBSA"), 2008 Tenn. Pub. Acts, ch. 1063. SEIRMPBSA set forth rules for the use of isolation, restraint, and positive behavioral supports in Tennessee schools, in particular with regard to special education. Among its stated purposes were "[t]o ensure that every student receiving special education services is free from the unreasonable, unsafe and unwarranted uses of isolation and restraint practices" and "[t]o ensure that teachers of students receiving special education services are properly trained to protect the student, teacher and others from physical harm, if isolation or restraint is necessary." *Id.* § 2(1), (4).

In 2008, with SEIRMPBSA on the books, Tennessee again sought and received federal funding under the IDEA. Assurance 1 remained the same, and, indeed, it has remained the same every year since, with Tennessee assuring OSEP, each year, that it would ensure that every Tennessee child from ages 3 to 21 would receive a FAPE, as defined by the IDEA. 2018 Assurances at II-1; 2017 Assurance at II-1; 2016 Assurance at II-1; 2015 Assurance at II-1; 2014 Assurance at II-1; 2013 Assurance at II-2; 2012 Assurance at II-2; 2011 Assurance at II-2; 2010

Assurance at II-2; 2009 Assurance at II-2; 2008 Assurance at II-2. Throughout that time, the statutory definition of "FAPE" has continued to include the requirement that, to qualify as a FAPE, a student's special education and related services must comply with both the minimum standards set forth by federal law and any supplemental state special education standards. 20 U.S.C. § 1401(9).

In 2011, SEIRMPBSA was modified and superseded by the Special Education Behavior Supports Act ("SEBSA"), which retained SEIRMPBSA's purposes but replaced several provisions and added others. 2011 Tenn. Pub. Acts, ch. 457, *codified at* Tenn. Code Ann. § 49-10-1301 to -1307. Tennessee has continued to accept federal funds and assure the federal government that every qualifying child receives a FAPE. 2018 Assurances at II-1.

**B. Dickson County School District's Treatment of J.M.**

J.M. is a student in the Dickson County School District ("DCSD"). It is undisputed that J.M. has multiple disabilities—including autism, intellectual disability, obsessive compulsive disorder, anxiety, and attention deficit hyperactivity disorder—which entitle him to a FAPE under the IDEA. (Docket No. 12 ¶ 9.) In 2010, J.M. began attending DCSD's White Bluff Elementary School as a kindergartener. (Docket No. 67-2 (Promise Mata Deposition) at 79.) By the end of J.M.'s third grade year, he had begun exhibiting what White Bluff personnel described as "aggressive behavior towards staff and peer[s]" and "elopement issues." (*Id.* ex. 19.) At the time, teachers identified J.M.'s aggressive behaviors as occurring, on average, twelve times per day and sometimes as many as over eighty times in a single day. (*Id.*) He was referred for a functional behavioral assessment, and, by fifth grade, he was receiving speech/language therapy, occupational therapy, and applied behavior analysis therapy. (*Id.*) He continued to exhibit

aggressive behaviors, including screaming, kicking, throwing objects, spitting, and head butting. (*Id.*)

White Bluff made a number of efforts to address J.M.'s behavior, including referring him to a behavior interventionist, who sought to develop coping strategies for him. (*Id.* at 13–14, ex. 19.) Although J.M. experienced some improvement, Ms. Mata and the other members of J.M.'s individualized education program ("IEP") team[2] agreed, in February 2016, that White Bluff could not provide the resources, environment, and services necessary for J.M.'s needs. (*Id.* at 14, ex. 22.) They decided to transfer him to New Directions Academy ("NDA"), a school within the DCSD characterized as having a "behavior first" approach. (*Id.*) The purpose of transferring J.M. to NDA was to put him in an environment with more behavioral supports, including a one-on-one aide to work with him throughout the day. (*Id.* at 187–90.) Once J.M. was at NDA, his IEP team formulated a new IEP that took his new environment into account for the remainder of the fifth grade year and carrying into his sixth grade year. (*Id.* at 186–87.)

J.M., however, continued to exhibit aggressive and disruptive behavior. His teachers attempted, when possible, to respond to those behaviors with de-escalation techniques, such as offering him sensory toys or giving him the opportunity for a break from the other children. (Docket Nos. 65 at 6, 67-3 (Jeremy Howell Deposition) at 24.) Sometimes, however, de-escalation was ineffective, or J.M's behavior was so dangerous or disruptive that it required an immediate, more decisive response to ensure the safety of all involved. NDA has documented a number of

---

[2] The IDEA's IEP requirement provides the structure through which educators and parents work together to chart the course for providing a FAPE. 20 U.S.C. § 1412(a)(4); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (referring to the IEP process as the "central vehicle for" collaboration between parents and schools under the IDEA). Decisions regarding a child's special education and related services are made by an IEP team "comprised of the parents, at least one teacher of the child, a special education teacher, a representative of the local education department, 'an individual who can interpret the instructional implications of the evaluation results,' and any other individuals with special expertise." *N.L. ex rel. Mrs. C. v. Knox Cty. Sch.*, 315 F.3d 688, 689 (6th Cir. 2003) (quoting 20 U.S.C. § 1414(d)(1)(B)).

instances during the 2016-17 school year when school personnel used restraint on J.M. in response to his most dangerous behaviors. (Docket No. 67-19.) NDA's reports on the incidents describe J.M.'s being restrained after slapping, pinching, kicking, biting, and scratching NDA staff. (*Id.* at 4, 6, 8, 10, 12.) The uses of restraint that were documented mostly lasted only a few minutes, and the reports show that Ms. Mata was informed of the use of the restraint after school for each of the uses documented. (*Id.* at 3, 5, 7, 9, 11.) The Complaint filed in this case does not take issue with any of these uses of restraint.

However, J.M., through Ms. Mata, alleges that, in addition to the properly documented uses of restraint, NDA also repeatedly, during the 2016–17 school year, subjected J.M. to undocumented isolations in a manner that violated both the substantive and procedural guarantees of SEBSA. The State Defendants concede that, in at least one instance—on February 10, 2017— J.M.'s teacher, Jeremy Howell, placed J.M. in isolation in an "intensive problem solving" ("IPS") room that did not meet the physical requirements for an isolation room under SEBSA. (Docket No. 67-15 (Karen Willey Deposition) at 68–69).) For example, SEBSA requires that "[a]ny space used as an isolation room shall be . . . unlocked and incapable of being locked," Tenn. Code Ann. § 49-10-1305(g)(1), but the IPS room in which Howell placed J.M. was capable of being locked, and, indeed, one of its doors was locked for a period of time while J.M. was inside. (Docket No. 67-15 (Willey Deposition) at 69.)

Ms. Mata became aware of the February 10, 2017, isolation shortly after it occurred. She complained to the school and sought information about both that isolation and the possibility of other instances of improper isolation of J.M. (See Docket Nos. 67-28 & -29.) Although the State Defendants argue that the improper February 10, 2017, isolation was a unique occurrence, Ms. Mata claims that information revealed to her by DCSD personnel suggested that J.M. had been

improperly isolated numerous times. Specifically, NDA's records indicate numerous "time outs" for J.M. other than the February 10, 2017 isolation, and Ms. Mata has testified that, in her conversations with DCSD personnel after she confronted them about J.M.'s treatment, the NDA personnel indicated that J.M. was placed in an ISP for at least some of those time outs. (Docket No. 78-1 (Promise Mata Deposition) at 88–89.) According to Ms. Mata, NDA revealed to her that at least some of those time outs involved J.M.'s being placed in the smaller of two ISPs, the area of which was fewer than forty square feet, in violation of Tenn. Code Ann. § 49-10-1305(g)(6). (*Id.* at 98–104, 108–12.)

The evidence shows that Howell and other DCSD personnel received some training related to SEBSA before the 2016–17 school year, but it was limited. (Docket No. 79 ¶¶ 19–29, 38–39.) The State of Tennessee offered additional training to school districts but apparently did not require DCSD to take part. (*Id.* ¶¶ 51–52, 59.) In August 2017, following the discovery of the improper isolation or isolations of J.M., the TDOE released an "FAQ" document providing basic guidance for schools regarding compliance with SEBSA. (*Id.* ¶¶ 40, 55; *see* TDOE, Frequently Asked Questions: Restraint and Isolation for Students with Disabilities.[3]) The document had apparently been in a draft state for at least eight months. (Docket No. 79 ¶ 55.)

In the nearly two years since Ms. Mata first complained about NDA's treatment of J.M., NDA has taken steps to rectify and improve its policies regarding the handling of aggressive students, in particular with regard to the use of isolation. It removed the doors from its ISP rooms and brought in a behavioral specialist to provide additional training to its personnel over the summer of 2017. (Docket No. 79 ¶¶ 11–12.) J.M. was not isolated at all during the 2017-18 school

---

[3] Available at https://www.tn.gov/content/dam/tn/education/special-education/ri_faq.pdf.

year, and it is undisputed that he is "excelling now at NDA because they have better training and staff." (*Id.* ¶¶ 7, 9.)

## C. Procedural History

Ms. Mata filed a Complaint on J.M.'s behalf against DCSD on March 2, 2017, and filed a First Amended Complaint ("Amended Complaint") adding the State Defendants on April 19, 2017. (Docket Nos. 1 & 12.) Count I of the Amended Complaint pleads claims against all defendants under the IDEA. (Docket No. 12 ¶¶ 43–44.) Count II pleads claims against all defendants under Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("Title II"), 42 U.S.C. § 12101 *et seq.* (*Id.* ¶¶ 45–48.) Counts III and IV plead common law claims against DCSD only. (*Id.* ¶¶ 49–59.) On May 30, 2017, Ms. Mata, DCSD, and DCSD's insurer moved the court to approve a settlement of all claims against DCSD. (Docket No. 16.) On June 12, 2017, the court approved the settlement following a hearing in chambers. (Docket No. 24.)

On July 31, 2017, the State Defendants filed a motion to dismiss the remaining claims. (Docket No. 25.) The State Defendants made two arguments: first, that J.M. had failed to plead a violation of the IDEA because his only allegations were about improper isolations under SEBSA; and, second, that even if J.M. had pled violations of the IDEA, he pled only violations by the DCSD, not the State Defendants. (Docket No. 26 at 3–5.)

The court denied the motion. As the court explained, both this court and the Eastern District have held that the IDEA's definition of "FAPE" incorporates compliance with SEBSA. (Docket No. 31 at 6–7 (citing *N.S. ex rel. J.S. v. Tenn. Dep't of Educ.*, No. 3:16-CV-0610, 2017 WL 1347753, at *9 (M.D. Tenn. April 12, 2017); *I.L. ex rel. Taylor v. Knox Cty. Bd. of Educ.*, 257 F. Supp. 3d 946, 964 (E.D. Tenn. 2017)). An allegation that defendants provided special education

and related services that violated the substantive provisions of SEBSA, therefore, was also an allegation of a denial of a FAPE. (*Id.*) With regard to the State Defendants' second argument, the court noted that, "[u]nder the IDEA, the responsibility for ensuring that disabled students receive a free appropriate public education lies with the state educational agency (SEA)," not merely local school districts. (*Id.* at 9 (quoting *Ullmo ex rel. Ullmo v. Gilmour Acad.*, 273 F.3d 671, 679 (6th Cir. 2001)).) The court concluded that, because J.M.'s Amended Complaint alleged "systemic, state-level failures that only the State Defendants can rectify," he had stated a claim against those defendants, and they were not entitled to dismissal of the claims against them. (*Id.* at 9.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is

"genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Enforceability of SEBSA through the IDEA

The State Defendants renew their argument that a plaintiff cannot sue under the IDEA for a violation of SEBSA, noting, first, that SEBSA itself does not create a private right of action. *See* Tenn. Code Ann. § 1-3-119(a) ("In order for legislation enacted by the general assembly to create or confer a private right of action, the legislation must contain express language creating or conferring the right."). The State Defendants are correct that, if the federal government sought to force the State of Tennessee to adopt a state-law cause of action that had never been recognized by its General Assembly or common-law courts, a number of constitutional issues might arise. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476–77 (2018) ("[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.") (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). J.M., however, has not asserted a state-law cause of action arising out of SEBSA. He has pled a federal cause of action under the IDEA. The determinative question, then, is whether Congress has created a cause of action, under the IDEA, that can encompass SEBSA violations.

The State Defendants argue that a plaintiff cannot file suit under the IDEA for a violation of SEBSA because "there is no mention of SEBSA in the text of the IDEA or its regulations." (Docket No. 65 at 10.) The IDEA's definition of "FAPE" incorporates all "standards of the State educational agency" related to special education and related services, 20 U.S.C. § 1401(9)(B), but it does not name any specific standard, from any state, by name. The IDEA's incorporation of state

standards through general language, however, is not unique. For example, the Assimilative Crimes Act "assimilates into federal law, and thereby makes applicable on federal enclaves . . . , certain criminal laws of the State in which the enclave is located," not by setting forth a laundry list of individual states' statutes, but by referring generally to "act[s] or omission[s] which . . . would be punishable if committed or omitted within the jurisdiction of the State . . . in which [the enclave] is situated." *Lewis v. United States*, 523 U.S. 155, 158 (1998) (quoting 18 U.S.C. § 13(a)). Another example comes from the federal statute prohibiting "patient dumping" by hospitals, which takes its damages formula from "those damages available for personal injury [or] financial loss, under the law of the State in which the hospital is located," without citing any particular state's laws. 42 U.S.C. § 1395dd(d)(2)(A)–(B); *see Reid v. Indianapolis Osteopathic Med. Hosp., Inc.*, 709 F. Supp. 853, 854 (S.D. Ind. 1989) ("The language of this federal statute . . . incorporates state standards to delineate the damages that would be available through . . . a civil action . . . ."). Even the Federal Rules of Civil Procedure employ such an approach. Federal Rule of Civil Procedure 4(e)(1), for example, uses general language to incorporate "state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Incorporating state standards by description, rather than enumeration, is not only ordinary practice, but it is also the most practical course of action in most cases, given the array of different state rules that may be at issue.

The State Defendants respond that, even if the IDEA incorporates some state laws, it can only do so for state laws that existed prior to the IDEA's enactment, because incorporating later-enacted state laws would be a "temporal impossibility." (Docket No. 65 at 10.) The Supreme Court, however, has considered the issue of prospective incorporation of state law in federal statutes and

concluded that the Constitution permits the practice. Discussing the Assimilative Crimes Act, the Court wrote:

> Having the power to assimilate the state laws, Congress obviously has like power to renew such assimilation annually or daily in order to keep the laws in the enclaves current with those in the States. That being so, we conclude that Congress is within its constitutional powers and legislative discretion when, after 123 years of experience with the policy of conformity, it enacts that policy in its most complete and accurate form. Rather than being a delegation by Congress of its legislative authority to the States, it is a deliberate continuing adoption by Congress for federal enclaves of such unpre-empted offenses and punishments as shall have been already put in effect by the respective States for their own government.

*United States v. Sharpnack*, 355 U.S. 286, 293–94 (1958). The IDEA's continuing incorporation of state laws is, therefore, consistent with Congress's power, as construed by the Supreme Court.

The State Defendants argue, in the alternative, that, even if Congress theoretically could incorporate a law such as SEBSA into the IDEA, the language of the IDEA does not provide sufficient notice that the State of Tennessee, by accepting federal funds, may be subject to a suit arising out of violations of SEBSA. The Supreme Court has held that the IDEA can only impose those obligations for which "a state official who is engaged in the process of deciding whether the State should accept IDEA funds . . . would clearly understand that" the state is accepting the obligation. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). As long as a state is on notice as to what its acceptance of funds entails, however, and it accepts the funds and attendant responsibilities knowingly and voluntarily, the state has, the State Defendants concede, waived its sovereign immunity and accepted liability to suit under the IDEA. (See Docket No. 81 at 8.)

The system imposed by the IDEA is unavoidably complex; any given child's education is likely to implicate three layers of government—federal, state, and local—as well as, potentially, multiple agencies, schools, teachers, and other professionals. It is understandable, then, that

confusion often arises with regard to what is required under the statute. On the specific question of whether the IDEA incorporates SEBSA into the requirements for a FAPE, however, the law is sufficiently clear to put the state on notice and support a cause of action. The IDEA's definition of "FAPE" adopts "the standards of the State educational agency," 20 U.S.C. § 1401(9)(B), and Tennessee's state educational agency—the TDOE—is charged with at least some aspects of overseeing the administration of SEBSA. *See* Tenn. Code Ann. § 49-10-1306(d), (f). SEBSA itself, moreover, is clearly intended to function hand-in-hand with the structure imposed by the IDEA; for example, it defines its scope in terms of the state's general special education statutes, Tenn. Code Ann. § 49-10-1304(a), and repeatedly mentions its functioning in relation to IEPs, *id.* § 49-10-1304(b), (d)(2). In light of the established structure of the IDEA and the plain intent by the General Assembly that SEBSA function as an integral part of the state's educational system, a reasonable policymaker would or should have known that SEBSA would be enforceable under the IDEA.

Finally, the State Defendants argue that SEBSA is not enforceable via the IDEA in this case because the gravamen of J.M.'s claim is not related to the denial of a FAPE. The State Defendants base this focus on the gravamen of the claim on *Fry v. Napoleon Community Schools*, in which the Supreme Court held that the gravamen of the claim determines whether a plaintiff suing under a statute other than the IDEA, but seeking relief available under the IDEA, must satisfy the IDEA's exhaustion requirements. 137 S. Ct. at 755. *Fry*, however, is about the procedural requirements governing some claims; it does not create any limitations on what conduct is covered by the IDEA as a substantive matter. To the contrary, *Fry*, if anything, demonstrates just how much the various laws and causes of action governing special education can overlap—and how, accordingly, a claim with its gravamen under one cause of action may still be viable under another.

*See Fry*, 137 S. Ct. at 756 (noting that "[t]he same conduct might violate all three" of the IDEA, Section 504, and Title II). The Supreme Court concluded that, where multiple federal causes of action related to special education overlap, the gravamen of the claim determines whether the plaintiff must satisfy the IDEA's exhaustion requirements for his non-IDEA claims. *Id.* at 755. *Fry*, however, does not suggest that, if the gravamen is not under the IDEA, an otherwise valid IDEA claim ceases to exist.

The IDEA creates a cause of action for a child who has been denied a FAPE by the agencies charged with ensuring that he receives one, if he meets certain procedural requirements. 20 U.S.C. § 1415(i)(2). "FAPE" is a legal term of art, defined by statute. 20 U.S.C. § 1401(9). Under that statutory definition, a child's special education and related services are not sufficient to qualify as a FAPE unless they comply with state special education requirements. 20 U.S.C. § 1401(9)(B). SEBSA creates such requirements and is, therefore, incorporated into the definition of FAPE. *I.L.*, 257 F. Supp. at 964. Providing a qualified child special education and related services that include isolations in violation of the substantive requirements of SEBSA is, therefore, a denial of FAPE and the appropriate subject of an IDEA claim. *Id.*

## B. Enforceability of State-Level Monitoring and Oversight Requirements

The State Defendants argue next that, even if a SEBSA violation can give rise to a suit under the IDEA, it cannot give rise to a suit against the State Defendants themselves. The State Defendants base their argument, in large part, on *Traverse Bay Area Intermediate School District v. Michigan Department of Education,* 615 F.3d 622 (6th Cir. 2010), in which the Sixth Circuit held that local education agencies had no cause of action under the IDEA against a state education agency alleged to have failed to satisfy its procedural obligations under the Act. *Id.* at 630.

The IDEA provides that

any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

20 U.S.C. § 1415(i)(2)(A). As the Sixth Circuit explained in *Traverse Bay*, the statute's reference to "a civil action with respect to the *complaint presented pursuant to this section*" refers to a complaint under 20 U.S.C. § 1415(b), which permits a party to challenge "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). The Sixth Circuit concluded that a local education agency could not sue the state educational agency as a "party aggrieved," because its grievance was not related to "the identification, evaluation, or educational placement of [a] child, or the provision of a free appropriate public education to such child." *Traverse Bay*, 615 F.3d at 628 (quoting 20 U.S.C. § 1415(b)(6)(A), (i)(2)(A)).

J.M.'s suit, in contrast, is directly related to the provision of a FAPE in the case of a particular child, namely. J.M. himself. Indeed, other than the absence of DCSD from this case due to settlement, J.M.'s claims are, in most ways, paradigmatic examples of alleged IDEA violations. J.M. is a disabled child entitled to a FAPE; his school district provided him with special education services, but those services fell short of statutory requirements that had been incorporated into the definition of "FAPE"; and, as a result, J.M.'s mother filed suit on his behalf. Although the party best situated to immediately affect J.M.'s education was DCSD, J.M. included the State Defendants because, under the express terms of the IDEA, "[t]he State educational agency is responsible for ensuring that . . . all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency . . . meet the educational standards of the State educational agency." 20 U.S.C. § 1412(a)(11)(A); *see also*

*Ullmo*, 273 F.3d at 679 ("Under the IDEA, the responsibility for ensuring that disabled students receive a free appropriate public education lies with the state educational agency (SEA).").

Nothing in the IDEA expressly limits a cause of action thereunder to local authorities; this court, accordingly, has joined others in concluding that a student may sue a state educational agency under the IDEA, if the state educational agency's failures actually led to the denial of the student's FAPE. *See Pachl v. Seagren*, 453 F.3d 1064, 1070 (8th Cir. 2006) ("[O]ur court has suggested that 'systemic violation' of the State's responsibilities under the IDEA might give rise to state liability."); *Kalliope R. ex rel. Irene D. v. N.Y. State Dep't of Educ.*, 827 F. Supp. 2d 130, 141 n.3 (E.D.N.Y. 2010) (noting that the state educational agency "is a proper defendant in this action, which challenges a [state] policy that allegedly interferes with the IEP development process for disabled students in a systemic manner"); *Fetto v. Sergi*, 181 F. Supp. 2d 53, 72 (D. Conn. 2001) ("The state education agency is a proper party to actions involving claims of systemic violations of the IDEA . . . ."); *Corey H. v. Bd. of Educ. of City of Chicago*, 995 F. Supp. 900, 913 (N.D. Ill. 1998) ("[C]ourts have found that the state educational agency is responsible for a local school district's systematic failure to comply with an IDEA mandate."). In order to prevail on his claims against the State Defendants, J.M. would be required to tie their alleged failings to the details of his treatment by DCSD. That inquiry, though, goes to whether the State Defendants are entitled to summary judgment on the particular facts of this case, not whether the IDEA permits suit against state-level defendants at all.

**D. Mootness of IDEA Claim**

The State Defendants argue next that, even if J.M. may have had viable IDEA claims against them at one point, those claims are now moot, because DCSD has now provided adequate training to its personnel with regard to isolations, J.M. is now thriving in an environment where he

16

is not at risk of unlawful isolation, and the IDEA affords no other relief particular to his case. J.M. argues that his claims against the State Defendants are not moot, because the State Defendants have not rectified the failures of training and oversight that led to DCSD's initial errors.

The federal courts have an ongoing obligation under Article III to limit their jurisdiction to cases that may actually affect the rights of the litigants. *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (citing *Sw. Williamson Cty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 276 (6th Cir. 2001)). When, therefore, the issue presented by a case is "no longer live" or when "the parties lack a legally cognizable interest in the outcome," the case becomes moot and falls outside the boundaries of Article III. *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue." *Cleveland Branch, Nat'l Ass'n for the Advancement of Colored People v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (citing *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).

 "The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties . . . ." *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (quoting *Crane v. Ind. High Sch. Athletic Ass'n*, 975 F.2d 1315, 1318 (7th Cir. 1992)). Because "general money damages are not available under the IDEA," *Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 916 (6th Cir. 2000) (citing *Crocker v. Tennessee Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 386–87 (6th Cir. 1992)), J.M. cannot rely on such damages to argue that his claims remain remediable. Nor can he rely on the possibility of injunctive relief against DCSD, which is no longer a party and is, by all accounts, now complying with SEBSA, at least with regard to J.M. J.M. still seeks injunctive and declaratory relief against the State Defendants,

requiring them to fulfill their oversight requirements under the IDEA and SEBSA, but he does not explain how that relief would remedy any injury suffered by J.M., who is now receiving an IDEA-compliant education from DCSD, regardless of the quality of the State Defendants' oversight.

J.M. likens this case to one in which a defendant has voluntarily ceased its unlawful behavior to evade jurisdiction. Generally, a defendant's "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). The problem facing J.M.'s claims, however, is not that the State Defendants have ceased their allegedly unlawful behavior, but that DCSD has. At the time J.M. filed his Amended Complaint, DCSD was, he alleged, failing to provide him with a SEBSA-compliant FAPE, a failure that was attributable, in part, to the State Defendants' failures of oversight. Now, though, DCSD has rectified its errors, and, even if the State Defendants are providing insufficient oversight and training to other school districts, those failures are not depriving J.M. of anything. In other words, this is not a case where the defendant that is asserting mootness has temporarily rectified its behavior to avoid liability. Rather, another defendant, DCSD, has changed its practices and adequately trained its personnel, and those actions severed the connection between the State Defendants' wrongdoing and J.M.'s injuries. "If events occur during [an IDEA] case . . . that make it 'impossible for the court to grant any effectual relief whatever to a prevailing party,' the [case] must be dismissed as moot." *I.L. by & through Taylor v. Tenn. Dep't of Educ.*, 739 F. App'x 319, 323 (6th Cir. 2018) (quoting *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011)). Declaratory or injunctive relief

against the State Defendants would no longer address the injuries giving rise to J.M.'s IDEA claim; his claims for that relief, therefore, are moot.

J.M. argues next that, even if no other relief is available, he may be entitled to compensatory education from the State Defendants. "An award of compensatory education is an equitable remedy that a court can grant as it finds appropriate." *Bd. of Educ. of Fayette Cty., Ky. v. L.M.*, 478 F.3d 307, 316 (6th Cir. 2007) (citing 20 U.S.C. § 1415(i)(2)(C)(iii); *Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1034 (9th Cir. 2006)). For example, if a student is denied a FAPE in a way that has hindered his progress in certain subject areas, a court may order specific compensatory educational services in an attempt to catch him up. *See, e.g.*, *Somberg ex rel. Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 177 (6th Cir. 2018) (affirming award of 1,200 hours of compensatory education in light of low scores in subject-area tests by student denied a FAPE); *Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 978 (6th Cir. 2012) (affirming award of 768 hours of compensatory instruction in reading, writing, and mathematics). J.M. does not, however, set forth any facts suggesting that compensatory education would be a necessary or appropriate remedy for a student's having been isolated in a way that did not comply with SEBSA. If there were evidence of specific educational deficits associated with the improper isolations, which would not have arisen if isolation had been administered appropriately or not at all, then compensatory education might be warranted. J.M., however, has identified no such deficits and has made clear, throughout this suit, that his primary concern has been with the conditions of his isolation and DCSD's failures to communicate with Ms. Mata about them, not any particular pedagogical effects.

The State Defendants have concrete and ultimately nondelegable responsibilities to ensure that Tennessee complies with its special education laws, and, when they fail in those

responsibilities and a denial of FAPE results, the affected student has a right to seek redress against them under the IDEA. Nevertheless, the student will be limited to the relief that the IDEA can provide, and the IDEA is chiefly a tool for securing adequate educational and related services, not for providing general monetary redress or hashing out broad questions of policy. Once a student's educational situation is remedied, and there remain no more correctives available to the court appropriate to that student's particular case, the IDEA provides no basis for keeping his litigation alive merely to consider abstract questions about the defendants' responsibilities. Because that is the case here, the court will grant summary judgment to the State Defendants on J.M.'s IDEA claims.

**E. Section 504 and Title II Claims**

The State Defendants argue that they are entitled to summary judgment on J.M.'s claims under Section 504 and Title II because J.M. has alleged, at most, a violation of both statutes by DCSD, not the State Defendants. J.M. argues that the State Defendants' failure to provide the minimum necessary oversight or guidance under SEBSA amounts to discrimination that is actionable under both statutes.

Section 504 of the Rehab Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Title II is nearly identical, with the exception of covering even public services that are not funded by federal financial assistance. 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."). The IDEA

expressly provides that plaintiffs may bring a private right of action for denial of a FAPE under Title II and Section 504, as well as under the IDEA itself. 20 U.S.C. § 1415(l); *see also Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 166 (6th Cir. 2003) ("Generally, the [IDEA], as amended 20 U.S.C. §§ 1400–20, informs a Rehabilitation Act discrimination claim which is buttressed by allegations that a public school district failed to appropriately accommodate a handicapped student's extraordinary educational needs.").

The Sixth Circuit has held that, in order to succeed on a Section 504 claim related to special education, "more harm is required than a denial of [FAPE]." *N.L. ex rel. Mrs. C. v. KCS Cty. Schools*, 315 F.3d 688, 695 (6th Cir. 2003). In particular, the Sixth Circuit has held that "the Rehabilitation Act further requires that the [plaintiff] must ultimately prove that the defendant's failure to provide [the plaintiff] with a [FAPE] was discriminatory. Surmounting that evidentiary hurdle requires that either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of" educating children with disabilities. *Campbell*, 58 F. App'x at 167 (internal citations and emphasis omitted*); see also Hill v. Bradley Cty. Bd. of Educ.*, 295 F. App'x 740, 742 (6th Cir. 2008) (affirming grant of summary judgment for defendant on a Section 504 claim because plaintiff could not show deliberate indifference).

The court considered the same basic issues with regard to Section 504 and Title II in *N.S. v. TDOE*, No. 3:16-cv-0610, which has been consolidated with this case. The court concluded that disputed issues of fact existed with regard to whether the State Defendants exhibited gross misjudgment in their failure to provide sufficient oversight and guidance to school districts under SEBSA:

> The State Defendants argue that there is no evidence in the record of bad faith or gross misjudgment. To the contrary, the evidence, if found true, may show that the defendants regularly allowed restraints and isolations to be performed on disabled children without following the applicable regulations governing their use and that

this was due to a failure to train and instruct faculty and staff members on the governing law. At the very least, this provides a basis by which a trier of fact could find gross misjudgment. The State Defendants were, further, on express notice that there was a lack of clarity among educators throughout the state as to the applicable laws, which should have put them on notice that these laws were not being followed and could have resulted in violations of rights to disabled students. Yet, the State Defendants did not act to implement even very basic recommendations by the [Advisory Council for the Education of Students with Disabilities] to prepare and disseminate [an FAQ] document that could offer some clarity, let alone take other affirmative efforts to ensure the enforcement of SEBSA regulations. Again, the trier of fact could certainly infer that this is the result of gross misjudgment, if not bad faith.

*N.S.*, Docket No. 33 at 32–33. The State Defendants argue that the reasoning of *N.S.* should not extend to this case because (1) the state has now published the FAQ document and has presented evidence suggesting that its delay in doing so was reasonable, and (2) the State Defendants have presented evidence that they did, in fact, provide adequate training and monitoring to school districts.

With regard to the first difference between this case and *N.S.*, it does not matter that the FAQ document has been released now, because J.M.'s Section 504 and Title II claims seek not merely declaratory and injunctive relief but retrospective damages, based on DCSD's actions before it received any such guidance. While the State Defendants have produced some additional evidence explaining why the document took as long as it did to release, it will be up to the court to determine whether those explanations are, in the totality of circumstances, convincing. The same is true with regard to the evidence of training and oversight. The mere fact that the State Defendants provided some training and engaged in oversight does not negate J.M.'s contention that what the State Defendants provided was so woefully inadequate with regard to preventing cases such as his that it amounted to gross misjudgment. The court, accordingly, will not grant the State Defendants summary judgment with regard to J.M.'s Section 504 and Title II claims.

**F. Exhaustion**

Under 20 U.S.C. § 1415(l), a plaintiff who has filed Section 504 and Title II claims that overlap with the IDEA may be required to exhaust his administrative remedies, as he would for an IDEA claim. *Fry*, 137 S. Ct. at 755. Under *Fry*, however, such exhaustion is not required if the gravamen of the plaintiff's claim is not for denial of a FAPE. *Id.* The State Defendants have argued that the gravamen of J.M.'s claims is not for the denial of his FAPE. As explained above, however, J.M.'s grievances regarding noncompliance with SEBSA are not so easily separated from the question of whether a FAPE was provided, because FAPE, as a legal term of art, encompasses J.M.'s SEBSA concerns.

In any event, even if IDEA exhaustion would ordinarily be required for a SEBSA-based Section 504 or Title II claim, J.M. points out, correctly, that it would not have been required with regard to the systemic-failure claims he has raised against the State Defendants. The IDEA does not require administrative exhaustion "when it would be futile or inadequate to protect the plaintiff's rights." *Donoho ex rel. Kemp v. Smith Cty. Bd. of Educ.*, 21 F. App'x 293 (6th Cir. 2001) (citing *Covington v. Knox Cty. Sch. Sys.*, 303 F.3d 912, 915 (6th Cir. 2000); *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir.1989)); *see also Honig v. Doe*, 484 U.S. 305 (1988) (holding that a claim under the predecessor statute to the IDEA could proceed in federal court without prior administrative exhaustion where such exhaustion would be futile). The administrative procedures available under the IDEA would, at most, have given J.M. and Ms. Mata the chance to address, prospectively, the school-level deprivations by DCSD and craft an educational remedy going forward in spite of the allegedly inadequate oversight to which DCSD was subject. Such procedures, however, would have been ill-suited to the issues of state-level culpability and systemic failures underlying their surviving claims. *See J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 114-15 (2d Cir. 2004) (acknowledging "the importance of exhaustion in

'textbook' cases presenting issues involving individual children where the remedy is best left to educational experts operating within the framework of the local and state review procedures" but holding that exhaustion was not required because the claims did not challenge the content of the individual IEP but, instead, challenged the school district's failure to prepare and implement IEPs on a wide-scale basis along with other systemic oversights involving proper notifications to parents and training of staff). The court, accordingly, will not grant summary judgment to the State Defendants based on J.M.'s failure to exhaust administrative remedies for his Section 504 and Title II claims.

## IV. CONCLUSION

For the foregoing reasons, the State Defendants' Motion for Summary Judgment (Docket No. 25) will be granted in part and denied in part. The State Defendants will be granted summary judgment with regard to J.M.'s IDEA claim but not his claims under Section 504 or Title II. An appropriate order will enter.

It is so ORDERED.

ENTER this 12th day of December 2018.

_____
ALETA A. TRAUGER
United States District Judge